**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | ) |
| | ) |
| **V.** | ) |
| | )     **CRIMINAL NO:  3:17-CR-00157** |
| **MARYAM A. ZAREI,** | ) |
| | ) |
| *Defendant.* | ) |

**DEFENDANT ZAREI'S
SENTENCING POSITION AND MEMORANDUM**

## I.  Introduction

COMES NOW, the defendant, MARYAM A. ZAREI (hereinafter referred to as the "Dr. Zarei"), by counsel, and for her Sentencing Position and Memorandum submits that she should be sentenced below the United States Sentencing Guidelines (USSG or Guidelines) range of 30-37 months for her conviction of Health Care Fraud, in violation of Title 18, United States Code, § 1347, as calculated by the United States Probation Officer (USPO) and promulgated in the Presentence Report (PSR). More specifically, Dr Zarei argues that the sentence within the abovementioned guideline range is "greater than necessary" to achieve the sentencing goals of 18 U.S.C. § 3553(a)(2).

For that reason, Dr. Zarei requests this Honorable Court to grant her a downward deviation or variance to any of the following alternative sentences: Imposition of a Term of Probation (U.S.S.G. § 5B1.1), Community Confinement (U.S.S.G. § 5F1.1), Home Detention (U.S.S.G. § 5F1.2), or Community Service (U.S.S.G. § 5F1.3).[1]  If the Court decides to sentence

---

[1] Dr Zarei acknowledges that according to her Guideline sentence, she is not eligible for any of the alternative sentencings requested, but in the aftermath of *United States v. Booker*, 543 U.S. 220 (2005), the Guidelines have

Dr. Zarei to an active sentence of incarceration that it sentence her to no more than one (1) year and one (1) day so that she can be given credit for time served.[2]  Dr. Zarei has agreed that she should and will make restitution to the Department of Medical Assistance Services and the health insurance carriers defrauded as well as forfeiting to the United States (Government) any fraud and theft-related assets as it deems proper.[3]  The requested alternative sentences by Dr. Zarei would be a sufficient sentence to reflect the seriousness of her offense, promote respect for the law, provide just punishment, afford adequate deterrence to criminal conduct, protect the public from further crimes of the defendant, avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar offenses, and provide restitution to any victims of the offense.[4]

## II. Statement of Facts

The facts of the offense are not in contention so without restating them, they are provided in the Statement of Facts[5] signed by Dr. Zarei, her counsel, and the Government and filed with the Plea Agreement[6] in the pleadings of this case and restated in PSR ¶¶ 10.A-D.  Nevertheless, Dr. Zarei will emphasize certain relevant facts of the case pertinent to her sentencing.

Dr. Zarei was born and raised in Iran.  Her childhood was not one of wealth and luxury, but one of humble means with many hardships as her country was involved in a revolution and a

---

now been deemed only as advisory, and the Court can impose any sentence it considers reasonable in light of the circumstances of the case to meet the statutory purposes of sentencing as found in 18 U.S.C. § 3553(a).

[2] 18 U.S.C. § 3624(b)(1); *Barber v. Thomas*, 560 U.S. 474 (2010).

[3] See Plea Agreement ¶¶ 8 and 9. (Docket Document 9).

[4] 18 U.S.C. § 3553(a).

[5] Docket Document 10.

[6] Docket Document 9.

war with the country of Iraq when she was growing up.[7]  When she was 14 years of age, she almost drowned in an accident and was saved by a man who had just arrived to the lake with his family.  Emergency personnel later arrived and attended to her.  After this near-fatal experience, she wanted to have a career in the health care profession.  A medical education in Iran was costly, and her parents did not have that kind of wealth.  Yet, she excelled in math and the sciences so she was able to attend a special high school for the gifted although it was not until she immigrated to this country that she could seek a profession in the medical arts.[8]

Her father died of cancer shortly after she immigrated to the United States with her husband, Mohsen Zarei, and as her family health history reveals, two of her sisters, Farzaneh and Farkhondeh Abedi, were also diagnosed with cancer, one of whom (Farkhondeh) passed away on November 17, 2013.[9]  Dr. Zarei herself has been diagnosed with some early symptoms consistent with and that may lead to cancer.  Although she does not have cancer now, her most recent mammogram shows her to be a high risk for cancer and her OBGYN has directed her to have a hysterectomy immediately as her medical reports so indicate.[10]   She had that surgery on March 15, 2018.[11]

---

[7] In her Objection, Corrections, and Additions (Docket Document 14-4), Dr. Zarei provided the Court with detailed facts of her upbringing and her recollections of growing up in war and the revolution.  Additionally, she attached to that pleading a more detailed letter to the Court revealing every aspect of her childhood, growing up in Iran, parents and family, journey to the United States, schooling, college, dental school, dental career, health and character in the hope of giving the Court a full understanding of her and who she is. (Docket Documents 14-5).  She is requesting the Court to refer to her letter and the facts of her life in this Sentencing Position.

[8] See letter #1 from Dr. Zarei (Docket Documents 14-5).

[9] Dr. Zarei's letter #1 to the Court filed with her Objection Pleading details the sadness and effect that her sister's death had upon her and its consequences to her. (Docket Documents 14-5).

[10] These medical records were filed on February 23, 2018 with her Objection Pleading. (Docket Document 14-4).

[11] See medical records of Dr. Zarei's recent surgery attached to this Sentencing Position and Memorandum. (Docket Document 20-1).

Coming to this country and speaking English sparsely, she did her best to become proficient in the English language. She became proficient enough to attend J. Sargeant Reynolds Community College (JSRCC), Virginia Commonwealth University (VCU), and subsequently, the VCU School of Dentistry.   By working multiple jobs at places like Hardee's Restaurant, Aunt Sarah's Restaurant, and the pharmacy at the Medical College of Virginia (MCV), she was able to put herself through college and dental school while working full-time.   Finally, in 2004, she graduated from dental school and obtained her license to practice dentistry in the Commonwealth of Virginia.   She became business partners with Dr. Narjes Abtahi,[12] but soon that partnership dissolved with Dr. Zarei purchasing the business to become its sole owner and operator (dentist) until she sold the business to Dr. Far Soltanian, DDS, on February 15, 2018. As a result of her conviction for Health Care Fraud for which she is now before this Court for sentencing, Dr. Zarei understands that her dentistry license will be revoked as she has notified the Board of Dentistry and the Department of Health Professionals of her conviction.[13]   In early March of this year, her licensure attorney received a letter from the Department of Health Professionals requesting additional information on her Health Care Fraud case.[14]   As such, she wants to put her professional and personal affairs in order regardless of what happens at her sentencing.

---

[12] As indicated in her Objection Pleading, Dr. Zarei lent Dr. Abtahi one-half of the purchase price of the business to buy it so that when she obtained her license she could go into practice with Dr. Abtahi.

[13] See Gerald C. Canaan, II, Esquire's letter of December 13, 2017 to Virginia Department of Health Professionals attached to her Objection Pleading.  (Docket Document 14-1).

[14] See letter of March 8, 2018 from Virginia Department of Health Professionals to Gerald C. Canaan, II, Esquire, attached to this Sentencing Positon and Memorandum. (Docket Document 20-2).

Throughout her dental practice, she afforded her patients with the best dental care she could give them. She treated them with compassion, care, and understanding as the many letters written on her behalf by patients so indicate.[15] Patients still came to her for their dental treatment even after finding out about the felony charge filed against her for which she pled guilty. They still trusted her with their care which should say much of the doctor-patient relationship she had with them, the manner in which she treated them, and the excellence of her skills as a dentist.

Although her patients mean much to Dr. Zarei, the paramount concern in her life has always been her family. While she was in Iran until she married and came to this country, she cared for her father when he was sick tending to him as she studied from home while others in the family worked. As one of her letters to the Court expresses, she feels the guilt for not being with her father when he died of cancer and not finding about his death until months later, because her family did not want to upset her and worry her while she was pregnant with her daughter.[16] When she discovered that both of her sisters had been diagnosed with cancer, she tried the best that she could to help both of them, but she was only able to bring Farkhondeh to this country when her cancer worsened. Knowing that her sister Farkhondeh did not have much longer to live, she took her sister to places that her sister always dreamed of going and spent as much time with her during the remaining time her sister had and even took her back to Iran to die and be buried.[17]

After her father's death, her mother's health began to deteriorate so Dr. Zarei brought her over to the United States to take care of her too in 1997. Although her mother lived with her and

---

[15] These many letters written by her patients were filed on February 23, 2018 with her Objection Pleading and Addendum. (Docket Documents 14-5 and 16-3). Additional letter #36 from Dr. Aysha Habib and letter #37 from Daniel Widner are attached with this Sentencing Position and Memorandum as Docket Documents 20-3).

[16] See Dr. Zarei's Letter #1 (Docket Documents 14-5).

[17] *Id.*

her family for a while, in March of 2007, Dr. Zarei purchased a condominium in Glen Allen, Virginia in which her mother could reside as her mother's health improved.   Dr. Zarei's brother, Alireza Abedi, lived with their mother to watch over her in case something happened.   Dr. Zarei would go over to her mother's on a daily basis to see how she was doing and to visit.   However, in recent years, her mother's health has worsened as she suffers with asthma, COPD, osteoarthritis, and severe depression.[18]   Recently, her mother had bilateral knee replacement surgery on March 26, 2018 and developed a pulmonary embolism (blood clot) in her lungs.[19] She has to be on a blood thinner for at least six (6) months so Dr. Zarei despite having surgery herself and recovering from it, has to take care of her mother at home to make sure she receives the proper care and correct dosage off medicines.   Her mother's medical providers have put her mother under Dr. Zarei's care.[20]   Dr. Zarei is worried for her mother, and she does not know how her mother will survive without her care.[21]

Unfortunately, Dr. Zarei's brother can no longer take care of their mother since his employment has relocated him to Texas, and he no longer resides at the condominium in Glen Allen.   Dr. Zarei's mother has now moved in with Dr. Zarei and her family again, because there is no one other than Dr. Zarei to take care of her mother.   Dr. Zarei has become her mother's caregiver.[22]  As Dr. Zarei's letters to the Court pleads, for her to be imprisoned would be

---

[18] See her mother's (Sadat Javadzadeh's) letter (Letter #5) filed with the other letters on February 23, 2018, and her doctor's (Aysha Habib, M.D.'s) letter (Letter #36) regarding her health which is attached to this Sentencing Position and Memorandum. Docket Documents 14-5 and 20-3).

[19] See her mother's recent medical records of her surgery and pulmonary embolism. (Docket Document 20-4).

[20] *Id.*

[21] See Dr. Zarei's Second Letter to the Court (Letter # 38, Docket Documents 20-3).

[22] Letter #36 from Dr. Aysha Habib.

detrimental to her mother, daughter and especially her son who is already traumatized by his aunt Farkhondeh's death.

Dr. Zarei and her husband have worked hard in their professions – she as a dentist; he as a pharmacist.  Both are well-respected in the community and in their professions.[23]  By several of her patients' accounts, Dr. Zarei is an excellent dentist.  She is highly-skilled, compassionate, and has superb bed-side manners, making a trip to the dentist less uncomfortable and stressful.[24]  Her expertise as a dentist is impeccable and compared to none, and she actually cares for her patients, some of whom have become her friends and still remain her patients and friends despite knowing of her conviction for Healthcare Fraud. [25]

Dr. Zarei and her husband have a close-knit family who support one another.  Her daughter Melika is in medical school at the Virginia Tech Carilion School of Medicine in Roanoke, Virginia, and her son Mahyar is in the pre-physical therapy program at Virginia Commonwealth University.  Dr. Zarei's personal history is a unique one, coming to this country with almost nothing, living in a cramped home with another family, working day and night to get ahead, and finally achieving her dream of working in the health care profession to help others.  Dr. Zarei's family upbringing and work ethic have contributed to her helping others as she was instrumental in bringing most of her family over to the United States from an oppressive regime in Iran and allowing them to live in their home and taking care of them until they could get a job and stand on their own two feet.[26]  Dr. Zarei has also been of assistance and offering a home-

---

[23] See Letters filed with Objection Pleading. (Docket Documents 14-5 and 16-3).

[24] *Id.*

[25] *Id.*

[26] *Id.*

away-from-home to international students and other ethnic individuals who come to this country without family here.

Through their hard-work, Dr. Zarei and her husband have purchased several pieces of property which her husband has refurbished and "flipped" houses, as the present vernacular calls it. In other words, he purchases properties with the goal of reselling them for a profit or renting them. Profit is generated either through the real estate market appreciating or from renovations and capital improvements. Their properties are listed under ¶ 48 of the PSR. Dr. Zarei explains how these properties were acquired and financed in the attachment to her Addendum to Objection.[27]

Tragically, cancer seems to be prevalent in Dr. Zarei's family. PSR ¶ 34. Due to her ethnic and religious background, she felt uncomfortable telling the USPO the complete details of her family background and especially the information of her own personal health complications, because counsel, a male, was present during the presentence interview. Being aware that the Court would want to know everything and anything about her that she wishes the Court to know before it sentences her, counsel advised her to write a letter informing the Court of everything she believed the Court should know about her for her sentencing. Her first letter is attached to her Objection Pleading,[28] and some of her information is summarized in the Objection Pleading ¶¶ 23-28(a.-gg.). Her second letter to the Court is attached to this Sentencing Positon and Memorandum as Letter #38, Docket Documents 20-3). To summarize her health issues here, Dr. Zarei is a high risk for breast cancer, and her OBGYN is concerned of certain physiological developments in her sexual and reproduction organs that he had advised her to have a

---

[27] See Addendum to Objection Pleading (Docket Documents 16 and 16-2).

[28] See Letter #1.

hysterectomy as soon as possible.[29] As stated above, she had that recommended hysterectomy surgery on March 15, 2018.[30]

### III. Objection to the Presentence Report

As noted in her Objection, Corrections, and Additions previously filed on February 23, 2018, Dr. Zarei objects to the USSG §3B1.3 enhancement of 2-levels attributed to her by the USPO, because she did not abuse a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense.[31] Without repeating that argument here, she relies on her Objection and supporting Memorandum of Law to state that the § 3B1.3 enhancement should not be applied merely because she was a dentist and the owner and operator of the dental practice for which she was responsible for the submission of claims to insurance companies for reimbursement.[32] Such status alone does not warrant the enhancement, nor does her fraud conviction alone warrant it. Her status as a dentist in her dentistry practice is no different than a typical case of fraud involving reimbursements from health care insurers along with the typical component of misplaced trust inherent in the concept of fraud.

In addition, it is important to note that United States of America (Government) agreed in the Plea Agreement that it would not recommend this USSG §3B1.3 enhancement to the Court at the time of sentencing.[33] As a result of this enhancement, Dr. Zarei's Guideline sentence

---

[29] See Dr. Zarei's Medical Records. (Docket Document 14-4).

[30] See Dr. Zarei's Medical Records. (Docket Document 20-1).

[31] Dr. Zarei has filed her Objection to the PSR and Memorandum in Support, and she incorporates and relies on that Objection and Memorandum in this Sentencing Position and Memorandum. (Docket Documents 14 and 15).

[32] See Docket Documents 14 and 15.

[33] See Plea Agreement ¶ 4. (Docket Document 9).

increased from 24-30 months to 30-37 months.  Dr. Zarei asks the Court not to apply this enhancement to her sentence.

## II.  Motion for a Downward Deviation or Variance

Both aggravating and mitigating factors towards sentencing need to be proven by a preponderance of the evidence by their proponents.  If the Government desires to have her sentence increased from the Guideline range, it has the burden of proof to do so. *United States v. Jones*, 31 F.3d 1304, 1316 (4th Cir. 1994); *United States v. Harris,* 882 F.2d 902, 907 (4th Cir. 1989).  Likewise, if Dr. Zarei wishes to have her Guideline sentence reduced and advances a mitigating factor to lower the sentencing range and potentially reduce the ultimate sentence, she has the burden of proof to establish that mitigating factor by a preponderance of the evidence. *Id.*

Prior *United States v. Booker*, 543 U.S. 220 (2005) where the Supreme Court held that the Guidelines were only advisory in nature and not mandatory, the only way to reduce a Guideline sentence was for the Court to grant a downward departure pursuant to *United States v. Koon,* 518 U.S. 81, 94-96 (1996).  *Koon* identified the downward departures in the Guidelines as those based on an encouraged factor; those based on a discouraged factor, or an encouraged factor already taken into account in the applicable guideline; and those based on factors not mentioned in the Guidelines.  If an encouraged factor, then the Court can depart on that factor if it is not already taken into account in the applicable guideline.  If a discouraged factor or an encouraged factor that has been taken into account already in the applicable guideline, the Court can only depart if the factor exists to an exceptional degree or that makes the case different from the ordinary case where that factor exists.  If the factor is not mentioned in the Guidelines, then the Court must consider the "structure and theory of both relevant individual guidelines and the

Guidelines taken as a whole, …[and] decide whether it is sufficient to take the case out of the Guideline's heartland." *Id.* It is important to note that departures on factors not mentioned in the Guidelines are "highly infrequent". *Id.*

Even with the advent of *Booker*, a sentencing court still must determine if the Guidelines were calculated correctly and whether any downward or upward departures were applicable. The Guidelines still remain "the lodestar of sentencing" in Federal court. *Peugh v. United States,* 569 U.S. 530, 544 (2013). In *Kimbrough v. United States*, 552 U.S. (2007), and *Gall v. United States,* 552 U.S. 38 (2007), the Supreme Court established that the Sentencing Guidelines are simply an advisory tool to be considered alongside other statutory factors listed in 18 U.S.C. § 3553(a).[34] Moreover, in two summary reversals, the Supreme Court expressed that the Guidelines cannot be used as a substitute for a sentencing court's independent determination of a

---

[34] (a) Factors to be considered in imposing a sentence. The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider—

    (1) the nature and circumstances of the offense and the history and characteristics of the defendant;

    (2) the need for the sentence imposed--

        (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

        (B) to afford adequate deterrence to criminal conduct;

        (C) to protect the public from further crimes of the defendant;

        (D) to provide the Dr. Zarei with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

    (3) the kinds of sentences available;

    (4) the kinds of sentence and the sentencing range established for--

        (A) the applicable category of offense committed by the applicable category of Dr. Zarei as set forth in the guidelines--

            (i) issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

            (ii) that, except as provided in section 3742(g) [18 U.S.C.S § 3742(g)], are in effect on the date the Dr. Zarei is sentenced;

    (5) any pertinent policy statement—

        (A) issued by the Sentencing Commission pursuant to § 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

        (B) that, except as provided in section 3742(g), is in effect on the date the Dr. Zarei is sentenced.[1]

    (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

    (7) the need to provide restitution to any victims of the offense

just sentence based upon consideration of the statutory sentencing factors. *Nelson v. United States*, 555 U.S. 350 (2009); *Spears v. United States*, 555 U.S. 261 (2009).   "Our cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable. …The Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable." *Nelson,* 555 U.S. at 352. *(emphasis included).*   Consequently, sentencing courts commit error by using a Guideline range as a default to be imposed unless a basis exists to impose a sentence outside that range.   Pursuant to Supreme Court precedent, this Court has the discretion to impose a just and reasonable sentence and one that is the least restrictive for Dr. Zarei to meet the sentencing purposes in 18 U.S.C. § 3553(a).

In determining a just and reasonable sentence, the Court has wide latitude to consider what evidence is reliable and relevant to derive a punishment to fit the offender and not merely the crime. *Pepper v. United States,* 562 U.S. 476, 480-81 (2011) (consideration of post-sentencing rehabilitation not foreclosed for resentencing). 18 U.S.C. §3551 et seq., imposes an "overarching instruction" that sentencing courts must select a sentence "sufficient but not greater than necessary" to achieve the sentencing goals in § 3553(a)(2).   *Kimbrough*, 552 U.S. at 101 (quoting 18 U.S.C. § 3553(a)(2)).   These goals include the need for the sentence to (A) reflect the seriousness of the offense, promote respect for the law, and provide just punishment, (B) afford adequate deterrence to criminal conduct, (C) protect the public from further crimes of the defendant, and (D) provide Dr. Zarei with educational or vocational training, medical care, or other correctional treatment in the most effective manner. *Gall*, 552 U.S. at 50, n. 6.   To arrive at a sentence that serves these goals without being greater than necessary, the Court can consider the many factors listed in 18 U.S.C. § 3553(a)(1)-(7) to "make an individualized assessment based on the facts presented.   If [the Court] decides that an outside the Guideline sentence is

warranted, [it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Id.*

Once a sentencing court accurately calculates the Guideline range, it should consider arguments that the Guideline sentence should not apply because the guideline itself fails properly to reflect 18 U.S.C. § 3553(a) considerations, establishes an unsound judgment, treats the defendant's characteristics in an improper way, or that a different sentence is appropriate regardless. *Rita v. United States*, 551 U.S. 338, 356 (2007). Next, the sentencing court must allow "both parties an opportunity to argue for whatever sentence they deem appropriate." *Gall,* 552 U.S. at 49. In light of these arguments, as mentioned above, the sentencing court must "consider all of the § 3553(a) factors," keeping in mind the "overarching provision instructing district courts to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing." *Kimbrough,* 552 U.S. at 101. In so doing, the sentencing court "must make an individualized assessment based on the facts presented" and cannot "presume that the Guidelines range is reasonable." *Gall*, 552 U.S. at 50. If the sentencing court believes "an outside-Guidelines sentence is warranted, [it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Id.*

Finally, the sentencing court "must adequately explain the chosen sentence." *Id.* This "allow[s] for meaningful appellate review" and "promote[s] the perception of fair sentencing." *Id.* Notably, if the court imposes "an unusually lenient or an unusually harsh sentence," it must provide "sufficient justifications" for its selection. *Gall,* 552 U.S. at 46. S*ee also Rita*, 551 U.S. at 356-58 (stating that "[t]he sentencing judge should set forth enough to satisfy the appellate court that he has . . . a reasoned basis for exercising his own legal decision making authority"). Reasons for imposing a variance sentence "must be tied to the factors set forth in §3553(a) and

must be accompanied by findings of fact as necessary." *United States v. Moreland,* 437 F.3d 424, 432 (4th Cir. 2006).   Nevertheless, if the sentencing court decides to grant a "sentence that constitutes a substantial variance from the Guidelines," the deviation need not "be justified by extraordinary circumstances".  *Gall,* 552 U.S. at 41.  In addition, a non-guideline sentence is not presumptively unreasonable.  *Rita,* 551 U.S. at 354-55 (courts of appeal may not "adopt a presumption of unreasonableness" for variance sentences).  The sentencing court may conclude that a Guidelines sentence is not appropriate and "should not apply" because "the case at hand falls outside the 'heartland' to which the Commission intends individual Guidelines to apply [citing Guidelines departure provision]" *or* "because the Guidelines sentence itself fails properly to reflect § 3553(a) considerations" *or* "because the case warrants a different sentence regardless." *Id.* at 351.

Pursuant to 18 U.S.C. § 3553(a)(1)-(7), the Court looks at the following factors to determine a reasonable sentence for the defendant:

**1. The nature and circumstances of the offense and the history and characteristics of the defendant.**

**(a) Nature and circumstances of the offense.**

As stated previously, Dr. Zarei pled guilty pursuant to a Plea Agreement to Health Care Fraud in violation of 18 U.S.C. § 1347 and a Statement of Facts accompanied that Plea Agreement so the facts of the offense will not be repeated here.[35]  She does not contest her guilt of committing the offenses.  The base offense level for this crime is 6 which would have netted Dr. Zarei with her Criminal History Category I to a sentence of 0-6 months making her eligible for a term of probation.  Adding the enhancement of 14 offense levels for loss of more than $550,000 but less than $1,500,000, Dr. Zarei's offense level dramatically increases to 20. The

---

[35] Docket Documents 9 and 19; PSR ¶¶ 10.A-D.

amount of loss is the major enhancement factor which increases her offense level as it does in most fraud cases, because it reflects the amount of greed that motivates most fraud defendants. However, consideration should be taken that the amount of Dr. Zarei's fraud is $66,680 above the minimum cutoff level of $550,000 for the 14-offense level increase.[36]  As such, it is on the low end of the monetary range established for the 14-level enhancement.

Additionally, even before the Government filed an Information against her, Dr. Zarei had been reimbursing Medicaid and Great Dental Plans, which administers Medicaid payments to healthcare providers as detailed in her Addendum to Objection previously filed on February 26, 2018.[37]  Counsel for Dr. Zarei provided full copies of an excel spreadsheet provided by Great Dental Plans to the government for their review and investigation of the "voids" or "reversal of claims" to Medicaid from Dr. Zarei.  According to her calculations, she has reimbursed Medicaid approximately $84,310.51 which she asks the Court to take into consideration at her sentencing. The Government requested the prior continuance of her sentencing so it could determine how much in these "voids" or "reversal of claims" were actually made by her to Medicaid.

**(b) History and characteristics of the defendant.**

Dr. Zarei argues that she should be given due consideration for her extraordinary family ties and responsibilities as a mitigating factor for a downward deviation.  Dr. Zarei realizes that

---

[36] These are the Government's monetary figures. As stated in Dr. Zarei's Addendum to Objection, she contends that she has reimbursed Medicaid at least the amount of $84,310.51 (Docket Document 16). Note that, Dr. Zarei wishes to amend paragraphs 14-16 of her Addendum to Objection as follows:

14. Dr Zarei claims that after she was audited by Medicaid, she went through other claims and found inadequate claims.  She notified Medicaid through web portal and requested them to void those claims.

15. Dr. Zarei insists that on all of the voids listed on the Excel spreadsheet, she did returned all the money for those voids.

16. As such if the figures provided by Medicaid are accurate, Dr Zarei should be given credit for those reimbursements or voids to Medicaid.

[37] See Addendum to Objection as amended. (Docket Document 16).

under pre-*Booker* sentencing analysis, U.S.S.G. § 5H1.6, which referenced extraordinary family ties and responsibilities, was considered a discouraged factor since family ties and responsibilities were not ordinarily relevant in determining whether a downward departure was warranted. *Koon, supra.* Likewise, she realizes that most of the case law in the Fourth Circuit do not support a downward departure based on this factor. *Elliott v. United States,* 332 F.3d 753 (4th Cir.), *cert. denied,* 540 U.S. 991 (2003) (primary caregiver to chronically ill husband not sufficient); *United States v. Wilson,* 114 F.3d 429 (4th Cir. 1997) (caring for children not extraordinary for departure); *United States v. Rybicki,* 96 F.3d 754 (4th Cir. 1996) (responsibility for wife and son not sufficient); *United States v. Weddle,* 30 F.3d 532 (4th Cir. 1994) (status as single custodial parent not a sufficient basis). Nevertheless, the commentary and application note to U.S.S.G. § 5H1.6 does allow some circumstances under which the Court could depart downward based on this factor.[38] But Dr. Zarei is not requesting a downward departure under the guidelines; instead, she is requesting a downward variance with her extraordinary family ties and responsibilities as one of the factors to support the request. The important issue to be

---

[38] *Circumstances to Consider.*—
*(A) In General.*—In determining whether a departure is warranted under this policy statement, the court shall consider the following non-exhaustive list of circumstances:
    *(i) The seriousness of the offense.*
    *(ii) The involvement in the offense, if any, of members of the defendant's family.*
    *(iii) The danger, if any, to members of the defendant's family as a result of the offense.*
*(B) Departures Based on Loss of Caretaking or Financial Support.*—A departure under this policy statement based on the loss of caretaking or financial support of the defendant's family requires, in addition to the court's consideration of the non-exhaustive list of circumstances in subdivision (A), the presence of the following circumstances:
    *(i) The defendant's service of a sentence within the applicable guideline range will cause a substantial, direct, and specific loss of essential caretaking, or essential financial support, to the defendant's family.*
    *(ii) The loss of caretaking or financial support substantially exceeds the harm ordinarily incident to incarceration for a similarly situated defendant. For example, the fact that the defendant's family might incur some degree of financial hardship or suffer to some extent from the absence of a parent through incarceration is not in itself sufficient as a basis for departure because such hardship or suffering is of a sort ordinarily incident to incarceration.*
    *(iii) The loss of caretaking or financial support is one for which no effective remedial or ameliorative programs reasonably are available, making the defendant's caretaking or financial support irreplaceable to the defendant's family.*
    *(iv) The departure effectively will address the loss of caretaking or financial support.*

decided at Dr. Zarei's sentencing is whether her extraordinary family ties and responsibilities and her medical condition and the medical and mental conditions of her mother are of an extraordinary mitigating nature to afford her a downward variance. Dr. Zarei argues that she meets the criteria for these circumstances.

Dr. Zarei's personal history is of a hard-working immigrant coming to America to pursue the American dream of becoming a health-care professional. Now, she is living a nightmare in facing going to prison for her wrongdoing. Dr. Zarei posits that she should be given due consideration to her background and how she came to this country without much of anything and through her hard work and perseverance, she became a skilled, talented, and compassionate dentist helping her patients and others who need her help.[39]  She wants the Court to know that her criminal conduct does not define her. The selection of an appropriate sentence for Dr. Zarei is better served by the Court having the fullest information possible concerning her life and characteristics, her human failings and accomplishments, and to consider the widest possible breadth of information about her to ensure that the punishment imposed by the Court will suit not merely the offense but her, the individual defendant. *Pepper,* 562 U.S. at 488. Dr. Zarei has accepted responsibility for her actions. She wants to right the wrong that she has committed and do what she needs to regain the trust and respect from her friends, family, and community. As some of those who know her can attest, she has shown extreme regret and remorse for her misdeeds.[40]

---

[39] See Letters and Supplemental Letters. (Docket Documents 14-5 and 16-3).

[40] Letter #8 from Fariba Azimi; letter #21 from Masoud Manjili; letter #23 from Dr. Peyman Nazmi.

As the many character reference letters from family, friends, and colleagues reveal,[41] she is a competent professional who is very thorough in the treatment of her patients.[42] She is a dentist who genuinely cares and has an authentic concern and understanding for the well-being of her patients.[43] She is dedicated and passionate about her work who would see patients at all hours of the day and night if they were in pain and needed dental work done on an emergency basis.[44] At times, when a patient did not have insurance or money, she would offer her services free of charge or at a discounted rate.[45] She is kind, compassionate, and respectful to her patients.[46] She willingly works with special needs individuals and the disabled when other dentists would not.[47] She has a personable way about her that makes her patients feel comfortable and relaxed to reduce the stress, discomfort and anxiety associated with undergoing dental procedures.[48] Patients trust her with their dental care as she is skilled, dependable, and knowledgeable in her craft offering quality dental care to her patients.[49] Some of her patients have been to different dentists in the past, and Dr. Zarei outclasses them all.[50] One of her patients

---

[41] Dr. Zarei respectfully requests that this Court read all of them before her sentencing as they afford the Court another perspective of her that is not reflected in the PSR.

[42] Letter #15 from Katie Ford; letter #19 from Norman King; letter #22 from Carol McDaid and John Shinholser; letter #27 from Nargis Shaikh; letter #30 from letter #27 from Nargis Shaikh; letter #37 from Daniel Widner; letter #38 from Jo Ann Widner.

[43] Letter #6 from Paige Abasolo; letter #10 from Dr. Ann Deaton; letter #18 from Herbert Heider; letter #30 from Kavita Tiwari; letter #32 from Nicholas Wilson.

[44] Letter #18 from Herbert Heider; letter #19 from Norman King, Jr.; letter #20 from Sarah Lopez.

[45] Letter #11 from Nicholas Deaton; letter #20 from Sarah Lopez; letter #33 from Ms. G. Winston.

[46] Letter #10 from Dr. Ann Deaton; letter #19 from Norman King, Jr.; letter #20 from Sarah Lopez.

[47] Letter #15 from Katie Ford; letter #33 from Mrs. G. Winston.

[48] Letter #7 from Dr. Ali Ansari; letter #27 from Jamil and Nargis Shaikh; letter #32 from Nicholas Wilson; letter #35 from Jo Ann Widner; letter #31 from Dan Widner; letter #32 from Nicholas Wilson.

[49] Letter #6 from Paige Abasolo; letter #11 from Nicholas Deaton; letter #15 from Katie Ford.

[50] Letter #7 from Dr. Ansari; letter #35 from Jo Ann Widner.

even travels two hours from out of town to seek her dental care when he could go to another dentist in his city.[51]

Most remarkable, her qualities as a dentist are also reflected in her as an individual as she shows compassion, kindness, and warmth to people in her community and contributes her time, and efforts.[52]   For example, she helped turn a neighbor's son away from drugs who remains drug free to this day and holding down a full-time job.[53]   She has organized a Sunday school class to expose young children to the Persian culture, and she cares and works with children and the elderly.[54]   She has helped families start their own business when they could not financially.[55] She demonstrates great generosity and hospitality to foreign students who come to the area to study by hosting them at her house, taking them shopping, cooking cultural foods for them, celebrating their traditions, and helping them adjust faster to the American culture.[56]   She mentors young adults into successful professionals by taking them under her wing in times of crisis.[57] She has become like a second mother to them.[58]

---

[51] Letter #26 from Ali Shaifiee.

[52] Letter #10 from Dr. Ann Deaton; letter #12 from Kate Deaton; letter #13 from Terry Lynn Finka; letter #21 from Masoud Manjili; letter #22 from Carol McDaid and John Shinholser; letter #23 from Dr. Peyman Nazmi; letter #24 from Dr. Tourage Rafeei; letter #28 from Denise Stevenson; letter #35 from Dr. Peyman Nazmi.

[53] Letter #13 from Terry Lynn Finka.

[54] Letter #7 from Dr. Ali Ansari.

[55] Letter #14 from Shirin Firouzabian.

[56] Letter #25 from Hossein Rekabdarkolaee.

[57] Letter #9 from Kevin Behrooz.

[58] Letter #31 from Albert Truong.

As already stated in the Statement of Facts and in her first letter to the Court,[59] Dr. Zarei has experienced much tragedy and hardships in her life.  She and her family survived the revolution led by the Ayatollah Khomeini.  They feared that their lives were in danger, because they were supporters of the Shah of Iran.  They lived through the war between Iran and Iraq with exploding missiles landing near their home in Esfahan, a main city which was targeted frequently by Iraq.  In addition, after the Revolution and the war with Iraq, conditions in Iran for the common people were poor to say the least.  Basic commodities were lacking, poverty was rampant, and corruption was prevalent.  The Western style-of-living under the Shah ceased to exist.  Inequality increased especially for women.  Being female reduced a woman to a second-class citizen.  A female was not encouraged to seek a profession or to become a doctor or health-care provider.  As such, Dr. Zarei had to overcome these sexual barriers and discrimination to even attend a school for individuals who excelled in mathematics and the sciences while caring for her sickly father in Iran.  It was not until she met her husband and married him was she able to leave Iran and pursue her dream of becoming a health-care provider in the United States. Coming to this country was bittersweet. Although she was seeking to better her life, she felt the guilt of leaving her father when he was sick with cancer.

Even living in this country was not easy for Dr. Zarei as she had to work several jobs to pay for her education while at the same time giving birth to two children.  Through hard work, perseverance, and learning to become proficient in the English language, she was able to attain her doctorate in dentistry, own her own dental practice, and treat her patients professionally and impeccably.  Despite committing this health-care fraud for which she stands before this Court, no

---

[59] Letter #1 from Dr. Zarei.

one can say that she did not afford her patients the best dental care possible as evidence by the letters written by her patients.[60]

Despite attaining the American dream, tragedy seems to follow Dr. Zarei wherever she goes.  After obtaining her dental license and establishing her own dental practice, she discovered that her beloved sister, Farkhondeh Abedi, was diagnosed with late stage cancer.  Dr. Zarei undertook the role of being her sister's caretaker by bringing her over to the United States where the best cancer treatment was available at the VCU Massey Cancer Center and where she could take care of her sister on a constant basis.  As some of the character letters filed with the Court indicate, Dr. Zarei was determined to make the few years left of her sister's life the best years of her life as she devoted her life to her sister to support her unconditionally until her death.[61]  She took in her sister and her family to live with her and her family so that she could manage her sister's treatments and take her to her doctor's and chemotherapy appointments.  She cared for her on a daily basis and assisted her in her hospice care.[62]  Finally, Dr. Zarei accompanied her sister back to Iran to make the final arrangements before her death.[63]  When it was determined that her sister's cancer was terminal, Dr. Zarei took her to all of the places that her sister wanted to see before she died, such as Niagara Falls in Canada, the Pacific Coast Highway in California, a cruise to Jamaica, Las Vegas, New York City, and Florida.[64]  As her sister's physician, Craig Swainey, M.D., writes in his letter to the Court, "During those last few months she [Farkhondeh

---

[60] See letters from patients.  (Docket Documents 14-5, 16-3 and 20-3).

[61] Letter #2 from Moshen Zarei; letter #3 from Melika Zarei; letter # 21 from Dr. Masoud Manjili.

[62] Letter #9 from Kevin Behrooz; letter #16 from Dr. Negar Ghochaghi; letter #24 from Dr. Tourage Rafeei.

[63] Letter #16 from Dr. Negar Ghochaghi; letter # 17 from Niloufar Ghochaghi.

[64] Letter #2 from Moshen Zarei.

Abedi] was completely dependent on Mrs. Zarei for all of her activities of daily living. In my opinion Mrs. Abedi wouldn't have lived as long as she did without the care of Mrs. Zarei."[65]

After her sister died, Dr. Zarei became a parent to her sister's daughters, Negar and Niloufar Ghochaghi, and raised them as if they were her own daughters. They lived with Dr. Zarei and her family. She encouraged them to pursue their education and supported them throughout their educational endeavors. She inspired and motivate them to go to graduate school, and as a result, Negar submitted her dissertation, earned her doctorate degree (Ph.D), and now is a professor at the ECPI University in Richmond. Niloufar is attending pharmacy school at the Massachusetts College of Pharmacy and Health Sciences and will graduate in 2020 to become a pharmacist like her uncle, Dr. Zarei's husband. As both of them wrote in their letters to the Court, losing their mother was devastating, but their aunt, Dr. Zarei, helped them find love and happiness again and helped them cope with their tragedy.[66] If not for her, they would not have become the successful professionals and individuals who they are today.

### 2. The need for the sentence to be imposed:

### (a) To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.

It cannot be argued that one crime is more serious than another. To a victim of a crime, the crime committed against that victim regardless of the type or nature of it is the most serious crime, because it happened to him or her. To say this or that type of crime is more serious than another does a disservice to the victims of all crimes and does not promote respect for them. But for purposes of argument in this Memorandum, Health Care Fraud can be classified as a white-collar, non-violent offense and not a crime against the person. It is not a terrorism-related

---

[65] Letter #29 from Dr. Craig Swainey.

[66] Letters #16 and #17 from Negar and Niloufar Ghochaghi respectfully.

offense or the hi-jacking of an airline or common carrier offense.  It is not a crime involving firearms, explosives, or weapons of mass destruction.  It is not a toxic waste offense or an environmental hazard crime, nor does it involve distribution of large amounts of illicit narcotics. Dr. Zarei's crime caused financial harm to those defrauded, but the safety and welfare of the country and the public at large were not at stake.  Thus, the seriousness of the offense to which the Dr. Zarei pled guilty is arguably not as serious, as is interpreted in legal parlance, as some of the aforesaid offenses.

The rule of law promotes that criminal defendants should be punished within reason and according to the crime for which they are convicted. Although the Court should avoid unwarranted sentencing disparities, a sentence below the Dr. Zarei's Guideline range will not be a disparate sentence.[67]  This Court and other courts alike have sentenced defendants below the Guideline ranges in Health Care Fraud cases, especially if the defendants show remorse and cooperate with the authorities as Dr. Zarei has done here.  She argues that even a sentence of probation with a fine is a reasonable sentence for her, because it not only promotes respect for the law but also provides just punishment for the offense committed by her.  Pursuant to the Plea Agreement, she will be ordered to pay restitution, and the Government will seek forfeiture of her assets.  Arguably, restitution and forfeiture are part of the sentence that will be imposed upon her.  In addition, the revocation of her dental license as a result of her felony conviction of Health Care Fraud, after earning it through her many hardships, is the greatest punishment.

**(b) To afford adequate deterrence to criminal conduct.**

For Dr. Zarei, a sentence below the Guidelines or even a sentence of probation would definitely deter her from committing further criminal acts. These occurrences, the publicity

---

[67] See Section III.A.5 below on page 29, **"The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."**

derived therefrom, and the loss of her license to practice dentistry are deterrence enough for her not to commit any further criminal acts.  There are contrary arguments on whether a prison sentence actually deters an individual after release or deters others from committing crimes.  The Government may argue that Dr. Zarei may deserve a lengthy sentence to deter future criminal conduct from her and others who decide to commit crimes like hers.  Current empirical research on general deterrence shows that while the certainty of punishment has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects. . . Three National Academy of Science panels reached that conclusion, as has every major survey of the evidence." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28-29 (2006).

The National Institute of Justice[68] has published in its "Five Things" series"[69], "Five Things about Deterrence."[70] Two of the five things relate to the impact of sentencing on deterrence – "Sending an individual convicted of a crime to prison isn't a very effective way to deter crime," and "increasing the severity of punishment does little to deter crime."[71]  The data show long prison sentences do not deter people from committing future crimes, and if

---

[68] The National Institutes of Justice (NIJ) is the research, development, and evaluation agency of the United States Department of Justice (DOJ).

[69] The NIJ "Five Things" series distill what it has determined from years of rigorous scientific inquiry. The "Five Things" series summarize an abundance of research, analysis, testing and evaluation to see how science applies to the decisions made every day in the field of criminal justice.

[70] https://nij.gov/five-things/pages/deterrence.aspx - Excerpts and highlights from: Excerpts and highlights from: Nagin, Daniel S., *"Deterrence in the Twenty-First Century,"* Crime and Justice in America: 1975-2025, ed. Tonry, M., Chicago, Ill.: University of Chicago Press, 2013: 199-264; Mulvey, Edward P., *"Pathways to Desistance: A Longitudinal Study of Serious Adolescent Offenders,"* (4 pages), Juvenile Justice Fact Sheet, Washington, D.C., U.S. Department of Justice, Office of Juvenile Justice and Delinquency Prevention, March 2011, NCJ 23097; Nagin, Daniel S., Cullen, Francis T., and Johnson, Cheryl L., *"Imprisonment and Reoffending,"* Crime and Justice: A Review of Research, Vol 38, ed. Tonry, M., Chicago, Ill., University of Chicago Press, 115-200 (2009); and Sampson, Robert J., Laub, John H., and Eggleston, E.P., *"On the Robustness and Validity of Groups,"* Journal of Quantitative Criminology 20(1) 37-42 (2004).

[71] The other three things are: 1) The *certainty* of being caught and punished, 2) the *perception* of being caught and punished are more powerful deterrents than the punishment, and 3) the death penalty does not deter murderers.

incarceration is required, there is evidence to suggest that short sentences may be a better deterrent if any. Incarceration is for punishment and incapacitation, not for deterrence. Deterrence can be achieved in other ways, such as the "perception" and "certainty" of being caught and punished, but punishment alone is not a deterrent.  Contrary to the belief that the severity of punishment "chastens" individuals convicted of crimes to be less likely to commit further crimes in the future, scientists and researchers have found that prison can actually increase, not reduce, recidivism.  For example, prisons themselves are learning centers on how to commit further crimes.  Once released from prison, defendants who have lost their support system of family and friends due to their incarceration, have the tendency to associate themselves with other released inmates with whom they have spent time.  Because they have lost their employment due to incarceration, they find it difficult to find jobs due to their felony convictions and their lack of advanced work skills to meet the demand of a progressive work force.   Faced with despair, they may resort back to crime. Thus, no empirical evidence exists to support this "chastening" effect of long prison sentences.

Although Dr. Zarei never plans to reoffend, she contends that a longer prison sentence actually lessens the deterrence factor against re-offending.  The longer a person stays in prison, the harder her potential becomes to re-enter the community as a successful contributing member of it.  She becomes less employable with a felony conviction and her diminishing and outdated work skills as a dentist.  Dr. Zarei's dentistry license soon will be indefinitely suspended or revoked, but hopefully, she can be gainfully employed in other areas of dentistry other than being a dentist.  The revocation of her license is the most effective deterrent imposed upon Dr. Zarei, because she can never be in a positon to commit health care fraud again.  The likelihood of her committing any other type of offense is non-existent as there is no record of any other type of

criminal offenses in her past.  She has an excellent support system and family as all of his character letters reference.  For Dr. Zarei, to be able to stay at home with her family, take care of her sickly mother, and not go to prison is the another deterrent for her not to reoffend.

**(c) To protect the public from further crimes of the defendant.**

It is simple-minded to declare that the longer Dr. Zarei is locked-up, the longer the public is protected from the commission of further crimes from her.  From the perspective of the pure number of years of her sentence, this might have some validity (*e.g.,* the maximum sentence of ten (10) years for the offense that the Dr. Zarei committed would keep the public protected from her for that period of time, but this is not the mandated goal towards sentencing in a civilized society.  The Court must fashion a sentence that is "…sufficient, but not greater than necessary to accomplish the goals of sentencing."  *Kimbrough,* 552 U.S. at 101, 128 S. Ct. at 570, 169 L. Ed. 2d at 494.  A structured, supervised probation is the best way to protect the public from further crimes of the defendant, but the public needs no protection from her.  It will be over two (2) years since Medicaid and Delta Dental audited her.  She has maintained stable and gainful employment while caring for her family.  This is evidence that she is no danger to the public or society and has been and will continue to be deterred from reoffending.

**(d) To provide the Dr. Zarei with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.**

If the Dr. Zarei is sentenced to a term of active incarceration, of course, she welcomes any educational or vocational training, medical care, or other correctional treatment in the most effective manner.  Due to her family needs as previously stated in this Memorandum, an institutional facility near them would be requested.

**3.  The kinds of sentences available.**

Although Dr. Zarei may be proposing a sentencing positon that is not widely-accepted, she is requesting that the Court impose an alternative sentencing for her instead of incarceration in the Federal Bureau of Prisons. After *Booker, Kimbrough, Gall,* and *Rita,* the Court is not mandated to follow the Guideline sentence recommendations and can deviate or grant any sentence that is reasonable and available. Dr. Zarei contends that imposing an alternative sentence is a reasonable sentence for her which meets the sentencing goals of 18 U.S.C. § 3553(a)(2) by imposing a sentence "sufficient but not greater than necessary" to punish her. The United States Sentencing Commission (the "Commission") in its May 2015 report on "*Alternative Sentencing in the Federal Criminal Justice System,*" which supplemented its January 2009 report on the same topic gives a background to the development of alternative sentences:

> The Sentencing Reform Act of 1984 envisioned sentences other than imprisonment as "generally appropriate . . . in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense." The Act established probation as a stand-alone sentencing option, rather than as an instrument used in suspending prison sentences. Alternative sentencing options were further expanded by the Anti-Drug Abuse Amendment Act of 1988, which authorized the use of home detention and electronic monitoring for offenders sentenced to probation and those serving terms of supervised release. The Commission incorporated these policies into the federal sentencing guidelines along with other probation and intermediate confinement options for less serious and first-time offenders.[72]

It is interesting to note that although alternative sentencings are infrequently imposed, when they are, defendants convicted of fraud offenses are more likely to receive such a sentence than defendants who are convicted of any other type of offense.[73]   Thus, Dr. Zarei does fit in that criminal category having pled guilty to a fraud offense.

---

[72] "*Alternative Sentencing in the Federal Criminal Justice System,*" Courtney R. Semisch, Ph.D., Senior Research Associate, Office of Research and Data, United States Sentencing Commission, page 1 (May 2015).

[73] *Id.* at 11.

District Courts throughout the United States have created specific alternative sentencing programs,[74] but the District Court for the Eastern District of Virginia (Richmond Division) has not.  The only available alternative sentencing that the Court can impose upon Dr. Zarei would be the Imposition of a Term of Probation (U.S.S.G. § 5B1.1), Community Confinement (U.S.S.G. § 5F1.1), Home Detention with Electronic Monitoring (U.S.S.G. § 5F1.2), or Community Service (U.S.S.G. § 5F1.3), and she requests the Court to consider imposing one of them instead of incarceration.  Dr. Zarei acknowledges that in accordance with the Guidelines, the sentencing alternatives as mentioned above apply only to sentences in the Zones A, B, and C while her sentence falls in Zone D in which the minimum sentence shall be satisfied by a term of imprisonment; however, she argues that the Court can consider these types of alternative sentences for her if it grants her a downward deviation or variance pursuant to *Booker, Kimbrough, Gall,* and *Rita.*  Under the Guideline sentencing scheme prior to *Booker*, these alternative sentences would have been available only if the defendant could prove that the circumstances of her case took it "out of the heartland" of cases.  After *Booker,* the Court can impose such alternative sentences or even any sentence if it deems appropriate under a so-called, "imperfect downward departure" – the factors may not be appropriate for a downward departure under the Guidelines, but they may be considered for a downward variance.

If a term of imprisonment is imposed by the Court, Dr. Zarei requests that the term of imprisonment be coupled with:

   a. A term of supervised release with a condition that substitutes community confinement or home detention according to the schedule in subsection (e) [of U.S.S.G. § 5C1.1.], provided that at least one month is satisfied by imprisonment; or a sentence of probation that includes a condition or combination of conditions that substitute

---

[74] *See Federal Alternatives-to-Incarceration Court Programs*, Brent E. Newton, Deputy Staff Director, United States Sentencing Commission (September 2017).

intermittent confinement, community confinement, or home detention for imprisonment according to the schedule in subsection (e).

b. A term of supervised release with a condition that substitutes community confinement or home detention according to the schedule in subsection (e), provided that at least one-half of the minimum term is satisfied by imprisonment.

U.S.S.G. § 5C1.1 (c) (d) and (e).[75]

In addition, if the Court does impose incarceration, Dr. Zarei requests it to be less than her Guideline recommended sentence of 30-37 months which is "greater than necessary" to achieve the sentencing goals of 18 U.S.C. § 3553(a)(2).

**4. The kinds of sentences and sentencing range established for the applicable offense and any pertinent policy statement.**

As provided in the PSR, the Guideline sentence for Dr. Zarei's applicable offense of Health Care Fraud is 30-37 months from which she is requesting a downward variance. However, post-*Booker*, the Court can imposed any sentence it deems reasonable after analyzing the sentencing factors in 18 U.S.C. § 3553(a) to include probation. Even in the Introduction and Authority section of the Sentencing Guidelines pre-*Booker*, the Guidelines state, "…the guidelines are to 'reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense . . . ." 28 U.S.C. § 994(j)." In addition, a one (1) year and one (1) day sentence can be imposed by the Court. 18 U.S.C. § 3624(b)(1).

**5. The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.**

---

[75] U.S.S.G. § 5C1.1 (e). <u>Schedule of Substitute Punishments</u>. (1) One day of intermittent confinement in prison or jail for one day of imprisonment (each 24 hours of confinement is credited as one day of intermittent confinement, provided, however, that one day shall be credited for any calendar day during which the defendant is employed in the community and confined during all remaining hours); (2) One day of community confinement (residence in a community treatment center, halfway house, or similar residential facility) for one day of imprisonment; (3) One day of home detention for one day of imprisonment.

One of the sentencing factors that the Court must consider in sentencing Dr. Zarei is unwarranted disparate sentencing. 18 U.S.C. § 3553(a)(6) mandates the Court to avoid unwarranted discrepancies in the sentencing of similarly-situated offenders. Although this is a statutory sentencing factor, the Fourth Circuit has recognized that it is but only one factor and if the sentencing court had considered that factor among all of the other factors extensively in 18 U.S.C. § 3553(a), the Guideline sentence imposed would not be disturbed on appeal. *United State v. Thorsen*, 633 F.3d 312, 321 (4th Cir. 2011). Nevertheless, since avoiding disparate sentences is a factor that the Court must consider, Dr. Zarei has procured the services of MCM Data Consulting, LLC,[76] to prepare a data analysis to determine comparative sentences imposed on defendants throughout the country in cases most similar to hers.[77] As the MCM Federal Sentencing Data Analysis (Analysis) for Dr. Zarei indicates, a sentence of probation would not be a disparate sentence for her as some of the U.S. District Courts in the country have imposed sentences of probation in cases similar to hers.

### A. Nationwide

Dr. Zarei has provided the MCM Federal Sentencing Data Analysis (Analysis) along with a List of Similar Cases (List) to hers as an Attachment to this Sentencing Position and Memorandum. She will attempt to summarize its findings to convince the Court that a sentence of probation would not be a disparate sentence in light of the circumstances of her case. The Analysis begins by taking data from 93,675 cases from 2002 - 2016 (post November 2001 Guidelines Manual when significant changes were made to USSG §2B1.1, most notably in the loss table). (Analysis, p.2 – Step 3). These 93,675 cases represent known court findings of

---

[76] See Attachment - MCM Data Consulting, LLC – Background and Experience. (Docket Document 20-5).

[77] See Attachment: ZAREI – USSG §2B1.1 FEDERAL SENTENCING DATA ANALYSIS (FSDA). ((Docket Document 20-6).

defendants' guideline calculations in those cases where the statutory guideline used to calculate the defendant's guideline scoring was USSG §2B1.1 under which Dr. Zarei is scored. (Analysis, p.2 – Step 3).

Narrowing further the number of cases to 44,680 occurs using criteria identical to the defendant's, such as, Criminal History Category I, no criminal history points, plea agreement entered, no mandatory minimum sentence involved, no loss or missing case information, known loss amount, and no 5K downward motion for substantial assistance. (Analysis, pp. 2-4 – Steps 4-9). Of these 44,680 cases, those which involved a 14-level increase for the amount of loss reduces the number of cases to 3,107.  (Analysis, p.4-5 – Step 10 and Table A).  Of these 3,107 cases nationwide, 222 or 7.1% of those defendants received probationary sentence; 2,858 or 92.0% of the defendants were sentenced to prison; and 27 or 0.9% were sentenced to time served. (Analysis, p.5 –Table A).  The average sentence imposed was 27.9 months.  (Analysis, p.5 – Table A).

Of the 3,107 defendants who received a 14-level increase for loss, 456 of them had a total offense level of 19 similar to Dr. Zarei's total offense level as calculated by the USPO.  Of these 456 defendants, 43 or 9.4% of the defendants received a probationary sentence, 411 or 90.1% of defendants were sentenced to a term of imprisonment, and 2 or 0.4% of the defendants were sentenced to time served. The average sentence imposed on these 454 defendants was 24.3 months of imprisonment.  (Analysis, p.6).

Of the 3,107 defendants who received a 14-level increase for loss, 98 of them violated 18 U.S.C. §1347 (Healthcare Fraud) only.  Of these 98 defendants, 11 or 11.2% of the defendants received a probationary sentence and 87 defendants or 88.8% were sentenced to a term of imprisonment. The average sentence imposed on these 98 defendants was 21.3 months of imprisonment.  (Analysis, p.6).  Of these 98 defendants, only 25 had the total offense level of 19

identical to Dr. Zarei's, and of these 25 defendants, 3 or 12.0% of the defendants received a probationary sentence and 22 or 88.0% of the defendants were sentenced to a term of imprisonment. The average sentence imposed on these 25 defendants was 18.2 months of imprisonment. (Analysis, p.7).

The Analysis further narrows the comparison of defendants and their cases to Dr. Zarei's case exactly and Guideline scoring as found in her PSR:  Offense Conviction (Healthcare Fraud - 18 U.S.C. §1347), Guideline (USSG §2B1.1), Base Offense Level (+6), Level of Loss (+14 – $550,000 - $1.5 Million), Abuse of Position of Trust Enhancement (+2), Acceptance of Responsibility (-3), and Total Offense Level of 19 (30-37 Months of Imprisonment).  Of the 98 defendants who received a 14-level increase for loss and violated only 18 U.S.C. §1347, 15 of these defendants had precisely the same Guideline scoring as Dr. Zarei. Of these 15 defendants, 2 or 13.3% of the defendants received a probationary sentence and 13 or 86.7% of the defendants were sentenced to a term of imprisonment. The average sentence imposed on these 15 defendants was 16.7 months of imprisonment.  None of these 15 defendants were sentenced in the Fourth Circuit.

### B. Fourth Circuit

The analysis also breaks down the sentences of other similarly-situated defendants to those found in the Fourth Circuit which encompasses the U.S. District Court for the Eastern District of Virginia.  Going back to the 3,107 defendants sentenced under the USSG §2B1.1 with a 14-level increase for loss, there were 300 defendants in the Fourth Circuit.  Out of the 300 defendants, 18 or 6.0% defendants received a probationary sentence, 279 or 93.0% of defendants were sentenced to a term of imprisonment, and 3 or 1.0% of the defendants were sentenced to time served.   The average sentence imposed on these defendants was 29.4 months of imprisonment.

More specifically, in the U.S. District Court for the Eastern District of Virginia, 72 out of the 300 defendants were sentenced in the Eastern District of Virginia under USSG §2B1.1 with a 14-level increase for loss.  Of these 72 defendants, 1 or 1.4% of the defendants received a probationary sentence and 71 or 98.6% of the defendants were sentenced to a term of imprisonment. The average sentence imposed on these 72 defendants was 30.1 months of imprisonment.

And out of the 98 defendants who received a 14-level increase for loss <u>and</u> violated only 18 U.S.C. §1347, 3 of these defendants were sentenced in the Fourth Circuit.  All 3 of these defendants were sentenced to a term of imprisonment and the average sentence imposed was 28.0 months.  None of these 3 defendants were sentenced in the Eastern District of Virginia.

### C. Overall

Numbers and statistics can be argued according to how one wants to argue them, but Dr.

Zarei presents all of the data accumulated and analyzed by MCM Data Consulting, favorable and unfavorable to her, so that the Court can consider this sentencing factor at her sentencing.

### Sentence of Probation - % of Defendants

| | | | | | |
|---|---|---|---|---|---|
| <u>USSG §2B1.1</u> | ◄ | ◄ | ◄ | ◄ | ◄ |
| <u>14-Level Increase</u> | ◄ | ◄ | ◄ | ◄ | ◄ |
| <u>Total Offense Level 19</u> | | ◄ | | ◄ | ◄ |
| <u>18 U.S.C. §1347</u> | | | ◄ | ◄ | ◄ |
| <u>Exactly as Dr. Zarei's</u> | | | | | ◄ |
| | | | | | |
| <u>Probation</u> (Nationwide) | 7.1% | 9.4% | 11.2% | 12.0% | 13.3% |
| (Fourth Circuit) | 6.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| (E.D. Va.) | 1.4% | 0.0% | 0.0% | 0.0% | 0.0% |

As the above data of defendants sentenced under USSG §2B1.1 show, a probationary sentence in a case, such as Dr. Zarei's, is not unheard of.  Overall nationwide, defendants sentenced under USSG §2B1.1 with a 14-level increase for loss received probation and/or fine 7.1% of the time. Those defendants with the same loss level and the same total offense level of 19 received probation 9.4% of the time.  Those with the same loss level and conviction of only 18 U.S.C. §1347 (Healthcare Fraud) were sentenced 11.2 % of the time to probation.  Those defendants with exactly the same loss level, same total offense level, and convicted of only 18 U.S.C. §1347, received probation 12.0% of the time.  Defendants with the same exact Guideline computation and offense conviction as Dr. Zarei were sentenced to probation 13.3 % of the time. In the Fourth Circuit, probation to those defendants with the same Guideline USSG §2B1.1 and loss level was 6.0%, and more specifically in the Eastern District of Virginia, 1.4%. However, defendants with the identical Guideline computations as Dr. Zarei's did not receive probation. Although Dr. Zarei's case is in the United States District Court of the Eastern District of Virginia which is located in the Fourth Circuit, nothing in 18. U.S.C. § 3553(a)(6) directs the sentencing court to compare only the similar cases of defendants in that circuit or district to avoid unwarranted sentence disparities.  Taking all of the cases of defendants committing similar wrongful conduct from throughout the country offers a larger and better sample of cases for the Court to compare.  Nationwide, as the chart indicates, 13.3% of all defendants with the exact Guideline computation as Dr. Zarei's are sentenced to probation. Thus, for this Court to sentence Dr. Zarei to a term of probation would not be unheard of or disparate in that there is nothing to compare such a sentence to.  The data reveals that nationally, similarly-situated defendants range from 7.1% to 13.3% in obtaining probation depending on what factors are taken in consideration. Even in the Fourth Circuit, probation has been granted to 7.1 % of defendants sentenced under

USSG §2B1.1 with a 14-level increase due to loss, and in the United States District Court for the Eastern District of Virginia, probation to such defendants has been granted 1% of the time.

***Average Sentences of Incarceration in Months***

| | | | | | |
|---|---|---|---|---|---|
| <u>USSG §2B1.1</u> | ◀ | ◀ | ◀ | ◀ | ◀ |
| <u>14-Level Increase</u> | ◀ | ◀ | ◀ | ◀ | ◀ |
| <u>Total Offense Level 19</u> | | ◀ | | ◀ | ◀ |
| <u>18 U.S.C. §1347</u> | | | ◀ | ◀ | ◀ |
| <u>Exactly like Dr. Zarei's</u> | | | | | ◀ |
| | | | | | |
| <u>Prison</u>  (Nationwide) | 27.9 | 24.3 | 21.3 | 18.2 | 16.7 |
| (Fourth Circuit) | 29.4 | ----- | 28.0 | ----- | ----- |
| (E.D. Va.) | 30.1 | ----- | ----- | ----- | ----- |

Nationwide incarceration sentences averaged 27.9 months when defendants were sentenced under USSG §2B1.1 and had a 14-level increase due to loss.  Those with the additional factor of a total offense level of 19 averaged 24.3 months.  Defendants without a total offense level of 19 but were convicted only of 18 U.S.C. §1347 (Healthcare Fraud) were sentenced to an average of 21.3 months.  Those defendants with the 14-level increase due to loss, a total offense level of 19, and only convicted of 18 U.S.C. §1347 (Healthcare Fraud) obtained an average sentence of 18.2 months.  Finally, defendants with the exact Guideline scoring as Dr. Zarei's were sentenced to an average of 16.7 months.  There were no cases in the Fourth Circuit or the United States District Court for the Eastern District of Virginia with the exact Guideline scoring like Dr. Zarei's to compare sentences.

MCM Data Consulting, LLC, compiled a list of cases of defendants exactly-situated as Dr. Zarei in that they were convicted of only 18 U.S.C. §1347 (Healthcare Fraud); Guideline

§2B1.1 was used to calculate the sentence with a 14-level increase due to loss ($550,000 - $1.5 million); abuse of position or special skill +2; acceptance of responsibility of -3 levels, criminal history category I with no criminal history points; no USSG § 5K1.1 downward departure; and scored precisely the same under the Guidelines as Dr. Zarei.[78]   Included in the list are short summaries of the reasons given by the Courts for their departure or variance, if any, from the Guideline sentence of 30-37 months, some of which are similar to Dr. Zarei's which have been stated previously in this Sentencing Position and Memorandum and will be argued at sentencing. Dr. Zarei hopes that if the Court imposes an active sentence of incarceration in prison that it would deviate or vary downward either to one (1) year and one (1) day or at the average sentence of 16.7 months.  These sentences would not be disparate as compared to the other defendants in the exact sentencing positon as Dr. Zarei.

**6.  The need to provide restitution to any victims of the offense.**

Dr. Zarei understands that pursuant to her plea of guilty and in accordance with the plea agreement and her role in this offense, the Court will order her to provide restitution of which she will pay in full as ordered by the Court.  Although the amount of restitution to Medicaid and the other healthcare insurers as listed in the PSR ¶ 51, p.14 is $616,680, Dr. Zarei has provided some information from DentaQuest/Great Dental Plans[79] to the Government indicating that the restitution amount to Medicaid may be in error.  Whatever the amount of full restitution is owed, she will make full payment of it as ordered.[80]

---

[78] See Attachment - ZAREI – MCM Data Consulting, LLC - List of Defendants Who Scored Precisely the Same Under the Guidelines as Dr. Zarei.

[79] See Attachment on DentaQuest. Also see Addendum to Objection (Docket Document 16) and Attachment from DentaQuest/Great Dental Plans (Docket Document 16-1) previously filed.

[80] The Government has received some information from DentaQuest, the largest Medicaid Administrator in the country regarding some potential paybacks or charge backs by Dr. Zarei to Medicaid. If these paybacks or

## Conclusion

The "overarching instruction" is for a sentencing court to impose a sentence "sufficient but not greater than necessary" to achieve the sentencing goals of 18 U.S.C. § 3553(a)(2). Dr. Zarei urges the Court to consider an alternative sentence other than incarceration.   If incarceration is required, then to deviate downward and grant her a variance from her Guideline sentence of 30-37 months to one (1) year and one (1) day coupled with some form of an alternative sentence such as probation, home detention, or community confinement or service. As such, a lesser sentence for her than that promulgated by the Sentencing Guidelines or an alternative sentence will achieve the sentencing goals of 18 U.S.C. § 3553(a)(2).

Respectfully submitted,
**MARYAM A. ZAREI**

By: _____ **/s/** _____

Michael HuYoung, Esquire (VSB #22095)
Barnes & Diehl, P.C.
6806 Paragon Place, Suite 110
Richmond, VA  23230
Telephone:  (804) 414-1602
Facsimile:   (804) 762-9654
Email: mhuyoung@barnesfamilylaw.com
*Counsel for Maryam A. Zarei, Defendant*

---

chargebacks are correct, then Dr. Zarei's restitution amount may be decreased from the amount of $616,680 as indicated in PSR ¶ 51, p.14.

## CERTIFICATE OF SERVICE

I do hereby certify that on this the **2nd** of March, 2018, I electronically filed the foregoing Sentencing Position and Memorandum with the Clerk of Court using the CM/ECF filing system which will send a notification of such filing (NEFG) to counsel of record and to:

> David T. Maguire, Assistant United States Attorney
> David W. Tooker, Special Assistant United States Attorney
> U.S. Attorney's Office for the Eastern District of Virginia
> 600 East Main Street
> Suite 1800
> Richmond, VA 23219
> Telephone: (804) 819-5400
> Facsimile: (804) 819-7417
> Emails: david.maguire@usdoj.gov; dtooker@oag.state.va.us

> Diane C. Moczydlowski
> United States Probation Officer
> U.S. District Courthouse, Suite 1150
> 701 East Broad Street
> Richmond, VA 23219
> Telephone:  (804) 916-2539
> Facsimile:  (804) 916-2550
> Email: Diane_Moczydlowski@vaep.U.S.C.ourts.gov

>           **/s/**
> Michael HuYoung, Esquire (VSB #22095)
> Barnes & Diehl, P.C.
> 6806 Paragon Place, Suite 110
> Richmond, VA  23230
> Telephone:  (804) 414-1602
> Facsimile:   (804) 762-9654
> Email: mhuyoung@barnesfamilylaw.com
> *Counsel for Maryam A. Zarei, Defendant*